# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MICHAEL C. HALPIN and MICHAEL A. CHRISTIAN, <br><br> Petitioners, <br><br> v. <br><br> RIVERSTONE NATIONAL, INC. a Delaware corporation, <br><br> Respondent. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) C.A. No. 9796-VCG <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| RIVERSTONE NATIONAL, INC., <br><br> Counterclaim Plaintiff/Third-Party Plaintiff, <br><br> v. <br><br> MICHAEL C. HALPIN and MICHAEL A. CHRISTIAN, <br><br> Counterclaim Defendants, <br><br> - and - <br><br> WALTER SMITH, STEPHEN DAVIS, and PÅL H. OTTESEN, <br><br> Third-Party Defendants. | |

## MEMORANDUM OPINION

Date Submitted: November 5, 2014
Date Decided: February 26, 2015

S. Mark Hurd and Christopher P. Quinn, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Danny David and Amy Pharr Hefley, of BAKER BOTTS LLP, Houston, Texas; *Attorneys for Petitioners/Counterclaim-Defendants Michael C. Halpin and Michael A. Christian.*

Blake Rohrbacher and Andrew J. Peach, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Harry H. Schneider, of PERKINS COIE LLP, Seattle, Washington; *Attorneys for Respondent and Counterclaim Plaintiff/Third-Party Plaintiff Riverstone National, Inc.*

Samuel T. Hirzel, II and Dawn Kurtz Crompton, of PROCTOR HEYMAN LLP, Wilmington, Delaware; *Attorneys for Third-Party Defendants Walter Smith, Stephen Davis, and Pål H. Ottesen.*

**GLASSCOCK, Vice Chancellor**

The right to statutory appraisal is the right to have this Court determine the fair value of shares of corporate stock subject to conversion, without the stockholder's consent, into other property by merger. A stockholder in such a situation may opt to forgo the consideration offered in the merger, in favor of fair value as it is determined in an appraisal action in this Court. The rights of holders of *preferred* stock are largely contractual, and this Court has found that such stockholders may waive appraisal rights *ex ante* by contract. However, the relationships between the common stockholders (the residual owners of the corporation), the directors (the fiduciaries managing the corporation on those owners' behalf), and the majority stockholder—if any—having voting control over the corporation (who also stands as a fiduciary to the minority stockholders in certain situations) are in the main governed by the Delaware General Corporation Law and the common law of fiduciary relationships. The question of whether *common* stockholders can, *ex ante* and by contract, waive the right to seek statutory appraisal in the case of a squeeze-out merger of the corporation is therefore more nuanced than is the case with preferred stockholders. That question has not yet been answered by a court of this jurisdiction.

In this action, minority common stockholders of a corporation seek appraisal of their shares after a June 2014 acquisition of the corporation by a third party, which was approved by the written consent of the corporation's 91% controlling

1

stockholder in May 2014. For the purposes of this Memorandum Opinion, I presume that the Petitioners have perfected their right to appraisal under Section 262 of the DGCL. The corporation has counterclaimed, however, and seeks summary judgment in its favor on the appraisal claims based on a stockholders agreement between the corporation and certain minority stockholders, including the Petitioners, entered into in 2009. That agreement provided the corporation with "drag-along" rights in case of a change in control, including the right to compel the minority stockholders to vote in favor of certain change-in-control transactions. Such a favorable vote would make the minority stockholders ineligible for appraisal rights, and indeed the corporation considers the stockholders agreement as embodying a right to force a waiver of appraisal on the minority common stockholders, which the corporation seeks to enforce specifically here. This would appear to raise the question limned above: may common stockholders, *ex ante*, contractually commit to a waiver of the appraisal rights provided by statute? I need not reach that question, however, because the unambiguous language of the stockholders agreement at issue only provides for the drag-along rights to be exercised prospectively—not after a merger has been accomplished. Since the corporation did not demand a vote in favor of a change in control in the manner explicitly required by the stockholders agreement, it may not specifically enforce the drag-along rights here, even if I assume that the waiver of

2

appraisal was otherwise enforceable. The stockholders agreement, accordingly, does not prevent the Petitioners from proceeding to appraisal.

## I. BACKGROUND FACTS

*A. Parties and Relevant Non-Parties*

Respondent, Counterclaim Plaintiff, and Third-Party Plaintiff Riverstone National, Inc. ("Riverstone" or the "Company") is a Delaware corporation.[1]

Petitioners and Counterclaim Defendants Michael C. Halpin and Michael A. Christian, and Third-Party Defendants Walter Smith, Stephen Davis, and Pål H. Ottesen (together, the "Minority Stockholders"), were individual stockholders of Riverstone during the period relevant to this dispute.

Non-party CAS Capital Limited ("CAS"), a private limited company organized under the laws of England and Wales, was the holder of a majority of the issued and outstanding shares of Riverstone's common stock—approximately 91%—during the period relevant to this dispute.

*B. The Stockholders Agreement*

On June 5, 2009, the Minority Stockholders entered into an agreement with Riverstone, then known as Consolidated American Services, Inc., setting forth certain rights and obligations of the Minority Stockholders (the "Stockholders

---

[1] Unless otherwise indicated, the undisputed facts set forth herein are taken from Petitioners' Verified Petition for Appraisal of Stock and Respondent's Answer to Verified Petition for Appraisal of Stock and Verified Amended Counterclaims and Third-Party Complaint, as well as the documents incorporated into these filings by reference.

3

Agreement"). Relevant here, Section 3 of the Stockholders Agreement granted Riverstone the power, subject to certain restrictions, to require the Minority Stockholders to tender and/or vote their shares in favor of a "Change-in-Control Transaction"[2] approved by a majority of Riverstone's stockholders (the "Drag-Along"). Specifically, Section 3 states, in relevant part:

> [I]f at any time any stockholder of the Company, or group of stockholders, owning a majority or more of the voting capital stock of the Company (hereinafter, collectively the "Transferring Stockholders") *proposes to enter into any [Change-in-Control Transaction], the Company may require the Minority Stockholders to participate in such Change-in-Control Transaction* with respect to all or such number of the Minority Stockholders' Shares as the Company may specify in its discretion, *by giving the Minority Stockholders written notice thereof at least ten days in advance of the date of the transaction or the date that tender is required,* as the case may be. *Upon receipt of such notice, the Minority Stockholders shall tender the specified number of Shares, at the same price and upon the same terms and conditions applicable to the Transferring Stockholders in the transaction* or, in the discretion of the acquirer or successor to the Company, upon payment of the purchase price to the Minority Stockholders in immediately available funds [(the "Participation Right")]. In addition, if at any time the Company and/or any Transferring Stockholders *propose to enter into any such Change-in-Control Transaction, the Company may require the Minority Stockholders to vote in favor of such transaction, where approval of*

---

[2] The Stockholders Agreement defines a "Change-in-Control Transaction" as

any transaction involving (a) a sale of more than 50% of the outstanding voting capital stock of the Company in a non-public sale or (b) any merger, share exchange, consolidation or other reorganization or business combination of the Company immediately after which a majority of the directors of the surviving entity is not comprised of persons who were directors of the Company immediately prior to such transaction or after which persons who hold a majority of the voting capital stock of the surviving entity are not persons who held voting capital stock of the Company immediately prior to such transaction.

Am. Countercls. and Third-Party Compl. Ex. A (Stockholders Agreement), at 2–3.

4

*the shareholders is required by law or otherwise sought, by giving the Minority Stockholders notice thereof within the time prescribed by law and the Company's Certificate of Incorporation and By-Laws for giving notice of a meeting of shareholders called for the purpose of approving such transaction* [(the "Voting Right")]. If the Company requires such vote, the Minority Stockholder agrees that he or she will, if requested, deliver his or her proxy to the person designated by the Company to vote his or her Shares in favor of such Change-in-Control Transaction.[3]

*C. Section 220 Action*

On May 20, 2014, Halpin and Christian made a demand for books and records on Riverstone pursuant to 8 *Del. C.* § 220, purportedly "to investigate potential self-dealing by the Company's directors and officers—namely whether such directors and officers usurped for themselves the Company's corporate opportunity to acquire equity in Invitation Homes, LP ('Invitation Homes') and B2R Finance, LP ('B2R')."[4] When Riverstone failed to answer the demand, Halpin and Christian filed a Section 220 action in this Court, on May 30, 2014.[5] The Section 220 complaint alleges that "certain directors and officers of the Company obtained the opportunity to acquire equity in Invitation Homes—a valuable opportunity that flows directly from the business relationship between the Company and its subsidiaries, on the one hand, and Invitation Homes and B2R, on

---

[3] *Id.* (emphasis added and omitted).
[4] Compl. for Inspection of Books and Records ¶ 5, *Halpin v. Riverstone National, Inc.*, C.A. No. 9720-VCG (Del. Ch. May 30, 2014), Trans. ID 55522638; *see also* Pet'rs'/Countercl.-Defs.' Opening Br. in Supp. of Their Mot. to Dismiss the Am. Countercls., at 4–5.
[5] *See* Compl. for Inspection of Books and Records ¶¶ 9–11, *Halpin v. Riverstone National, Inc.*, C.A. No. 9720-VCG (Del. Ch. May 30, 2014), Trans. ID 55522638.

5

the other hand."[6]  Although the Section 220 complaint acknowledges that the Company recognized and attempted to waive the "conflicts of interest inherent in the contemplated transactions," it nonetheless alleges that "the transactions were not approved in accordance with Delaware law."[7]

*D. The Merger and Information Statement*

Following the filing of the Section 220 action, on June 9, 2014, Riverstone sent a letter to its stockholders (the "Information Statement"), including the Minority Stockholders, informing them that on May 29, 2014, without notice to the Minority Stockholders, Riverstone's 91% majority stockholder CAS had provided its written consent pursuant to 8 *Del. C.* § 228 for the Company to enter into a merger agreement with Greystar Real Estate Partners, LLC ("Greystar") and its wholly-owned subsidiary ("Greystar Sub"), whereby Greystar Sub was to be merged into Riverstone and each share of Riverstone was to be converted into a right to receive cash (the "Merger Agreement").[8]  The Information Statement explained that—also unbeknownst to the Minority Stockholders—Riverstone, Greystar, and Greystar Sub executed the Merger Agreement the following day, on

---

[6] *Id.* ¶ 6.

[7] *Id.*

[8] Am. Countercls. and Third-Party Compl. Ex. B (Information Statement), at 1.

6

May 30, 2014, and the Merger became effective upon the filing of a certificate of merger with the Secretary of State of the State of Delaware, on June 2, 2014.[9]

The Information Statement provided additional guidance to Riverstone stockholders regarding their rights and obligations in connection with the Merger. First, the Information Statement attempted to invoke the Drag-Along to compel compliance with the Voting Right:

> Riverstone has exercised the "drag-along right" provided for in Section 3 of the Stockholders Agreement, dated June 5, 2009, . . . by and among Riverstone, Walter Smith, Stephen Davis, Pal [sic] H. Ottesen, Michael C. Halpin, and Michael A. Christian and specifically is requiring you to vote to approve the adoption of the Merger Agreement by executing and delivering the Written Consent, which is provided herewith . . . within 10 days after the date of this document.[10]

Next, the Information Statement advised stockholders that each share of the Company had been converted into a right to receive $4.44, plus any additional contingent payments that may become payable pursuant to the Merger Agreement. Finally, the Information Statement provided that stockholders "may be entitled to exercise appraisal rights under Section 262 of the DGCL,"[11] but that the abovementioned cash payment would only be available to stockholders who relinquished that right by executing the attached written consent pursuant to

---

[9] *Id.*
[10] *Id.*
[11] *Id.*

7

Section 228 (the "Written Consent"). In the paragraph outlining the stockholders' appraisal rights, the Information Statement explained:

> Riverstone has determined that if you execute and return the Written Consent provided herewith you will not be entitled to exercise appraisal rights. Riverstone further has determined that if you fail to execute and return the Written Consent you will be in breach of the provisions of the Stockholders Agreement referred to above, in which event Riverstone reserves all of its rights at law or in equity.[12]

*E. Procedural History*

Upon receiving the Information Statement, Halpin and Christian "voluntarily dismissed their Section 220 action in favor of pursuing their rights to appraisal."[13] On June 18, 2014, the five Minority Stockholders delivered to Riverstone separate written demands for appraisal of their respective shares pursuant to 8 *Del. C.* § 262—Halpin, Christian, and Smith each demanding appraisal of 132,265 shares, and Davis and Ottesen each demanding appraisal of 49,599 shares (totaling 495,993 shares).[14] The following day, on June 19, 2014, Halpin and Christian filed their Verified Petition for Appraisal in this action.

Riverstone answered the Petition for Appraisal on July 23, 2014, and brought counterclaims seeking to have the Drag-Along specifically enforced against Halpin and Christian. On August 8, 2014, Riverstone amended its

---

[12] *Id.* at 2.

[13] Pet'rs'/Countercl.-Defs.' Opening Br. in Supp. of Their Mot. to Dismiss the Am. Countercls., at 6; *see also* Notice of Voluntary Dismissal, *Halpin v. Riverstone National, Inc.*, C.A. No. 9720-VCG (Del. Ch. June 23, 2014), Trans. ID 55631691.

[14] *See* Am. Countercls. and Third-Party Compl. Ex. C (appraisal demand letters).

8

counterclaims to add the same specific performance claim against third parties Smith, Davis, and Ottesen. The Minority Stockholders brought Motions to Dismiss the amended counterclaims and third-party claims pursuant to Court of Chancery Rule 12(b)(6),[15] and Riverstone responded by filing a Motion for Summary Judgment. I heard oral argument on these motions together on November 5, 2014. At that time, the parties agreed that the matter had been fully submitted and should be treated as on cross-motions for summary judgment on a stipulated record.[16]

## II. STANDARD OF REVIEW

A motion for summary judgment pursuant to Court of Chancery Rule 56(b) will be granted only where the record reflects that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[17] Where the parties have submitted cross-motions for summary judgment on

---

[15] The Third-Party Defendants originally sought dismissal under Court of Chancery Rules 12(b)(2), (3), and (5), but they later amended their Motion to Dismiss to drop these defenses. *See* Third-Party Defs.' Am. Mot. to Dismiss the Third-Party Compl., at 2.

[16] *See* Oral Arg. Tr. 29:6–30:20. By citing and arguing material outside the Amended Counterclaims and Third-Party Complaint, the Minority Stockholders have converted their Motions to Dismiss into Motions for Summary Judgment. *See, e.g., In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) ("When the trial court considers matters outside of the complaint, a motion to dismiss is usually converted into a motion for summary judgment and the parties are permitted to expand the record."); Ct. Ch. R. 12(b). Additional time to expand the record is not necessary, as the parties have stipulated that the record before me is complete. *See* Oral Arg. Tr. 29:6–30:20.

[17] *E.g., QC Commc'ns Inc. v. Quartarone*, 2014 WL 3974525, at *8 (Del. Ch. Aug. 15, 2014).

a stipulated record, as the parties have done here, I may treat the matter as submitted for a decision on the merits.[18]

## III. ANALYSIS

Riverstone's Amended Counterclaims and Third-Party Complaint seek specific performance of the Minority Stockholders' obligations under the Drag-Along. Specifically, Riverstone asks the Court to order the Minority Stockholders to execute the Written Consent and accept the Merger consideration, thereby waiving the Minority Stockholders' rights to appraisal.

Specific performance is "an equitable remedy designed to protect a party's expectations under a contract by compelling the other party to perform its agreed upon obligation."[19] A party seeking specific performance must establish that (1) a valid contract exists entitling her to the performance sought, (2) she is ready, willing, and able to perform under the contract, and (3) the balance of equities tips in her favor.[20] This Court views specific performance as an extraordinary remedy, not to be awarded lightly,[21] and thus a party seeking specific performance must prove by clear and convincing evidence that she is entitled to specific performance

---

[18] *E.g., id.*

[19] *E.g., West Willow-Bay Court, LLC v. Robino-Bay Court Plaza LLC*, 2007 WL 3317551, at *12 (Del. Ch. Nov. 2, 2007).

[20] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010).

[21] *E.g., id.; West Willow-Bay Court, LLC*, 2007 WL 3317551, at *12.

10

and that she has no adequate remedy at law.[22] Because I find that Riverstone has failed to show that the Drag-Along requires the Minority Stockholders to execute the Written Consent and accept the Merger consideration, I deny Riverstone's request for specific performance.

*A. The Parties' Contentions*

The Minority Stockholders advance several theories as to why the Drag-Along fails to prescribe the performance sought by Riverstone.

### 1. Waiver of Appraisal

First, The Minority Stockholders argue that a common stockholder cannot waive its statutory right to appraisal *ex ante*—here, in a stockholders agreement in return for consideration that is to be set later by the controlling stockholder.

Riverstone disagrees, citing a line of Delaware cases permitting *preferred* stockholders to contract out of their appraisal rights.[23] In any event, Riverstone argues, this Court need not reach this question of law, because the Minority Stockholders did not expressly waive their rights to seek appraisal; rather, they merely "agree[d] to take actions that result in the loss of their appraisal rights."[24]

---

[22] *Osborn*, 991 A.2d at 1158; *see also In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 52 (Del. Ch. 2001) ("Delaware law . . . requires that a plaintiff demonstrate its entitlement to specific performance by clear and convincing evidence.").

[23] *See* Riverstone National, Inc.'s Br. in Supp. of Its Mot. for Summ. J. and Answering Br. in Opp'n to Mots. to Dismiss, at 7–8 (citing *In re Appraisal of Ford Holdings., Inc. Preferred Stock*, 698 A.2d 973 (Del. Ch. 1997); *In re Appraisal Metromedia Int'l Grp., Inc.*, 971 A.2d 893 (Del. Ch. 2009)).

[24] Riverstone National, Inc.'s Reply Br. in Further Supp. of Its Mot. for Summ. J. at 6–7.

11

## 2. Prospective vs. Retrospective Drag-Along

Second, the Minority Stockholders argue that, even if such a waiver is enforceable, Riverstone's effort to invoke the Drag-Along here was ineffective. Specifically, the Minority Stockholders argue that the Drag-Along could only be employed against the Minority Stockholders in transactions that had not yet been consummated, according to both the plain, prospective language of the contract and the operation of Delaware law. Both the Participation Right and the Voting Right state that Riverstone may invoke the rights when it "proposes" to enter into a Change-in-Control Transaction, and both set forth a requirement that Riverstone provide the Minority Stockholders notice in advance of the forced tender or vote.[25] The Minority Stockholders contend that this language establishes a prospective—not retrospective—scheme of rights.[26] A prospective scheme makes sense, and is in fact the only scenario in which these rights could be enforced, the Minority Stockholders argue, in light of the principle of Delaware law that once a merger becomes effective the shares of the acquired corporation are cancelled, having been legally converted into the right to receive cash or seek appraisal.[27] There being no actual shares left to vote or tender, the Minority Stockholders conclude that

---

[25] Am. Countercls. and Third-Party Compl. Ex. A (Stockholders Agreement), at 2–3.

[26] *See* Oral Arg. Tr. 11:23–12:13.

[27] Pet'rs'/Countercl.-Defs.' Opening Br. in Supp. of Their Mot. to Dismiss the Am. Countercls., at 8–9 (citing *Crown Books Corp. v. Bookstop, Inc.*, 1990 WL 26166, at *4 (Del. Ch. Feb. 28, 1990); *Shields v. Shields*, 498 A.2d 161, 168 (Del. Ch. 1985)).

12

Riverstone's attempt to exercise the Drag-Along a week after the Merger closed was ineffective.[28]

Riverstone counters that the Merger did not have the effect of neutralizing the Drag-Along. Riverstone distinguishes the cases relied upon by the Minority Stockholders for the principle that a merger cancels the underlying shares, arguing that *this* Merger had no such effect.[29] Even if it would have had such an effect, Riverstone argues, the parties nevertheless contracted around this result by stating in the Stockholders Agreement that, if the shares are converted into another form of property through a merger, "this Agreement shall inure to the benefit of the Company's successor, and this Agreement shall apply to the securities or other property received upon such conversion . . . in the same manner and to the same extent as the Shares."[30] In the Company's opinion, this language "provides that the [Minority] Stockholders can be required to comply with their drag-along obligations, even after the Merger."[31]

---

[28] *See id.*; Oral Arg. Tr. 12:5–13:16.

[29] *See* Riverstone National, Inc.'s Br. in Supp. of Its Mot. for Summ. J. and Answering Br. in Opp'n to Mots. to Dismiss, at 15–16 (distinguishing *Shields v. Shields*, 498 A.2d 161 (Del. Ch. 1985), on grounds that, unlike in *Shields*, here "the Merger was not a stock-for-stock merger, and Riverstone *is* the surviving corporation").

[30] Am. Countercls. and Third-Party Compl. Ex. A (Stockholders Agreement), at 5.

[31] Riverstone National, Inc.'s Br. in Supp. of Its Mot. for Summ. J. and Answering Br. in Opp'n to Mots. to Dismiss, at 18.

13

### 3. Adequate Notice

Third, the Minority Stockholders argue that, even if the Drag-Along can be invoked post-merger, Riverstone failed to do so by not abiding by the provision's notice requirement. As mentioned above, both the Participation Right and the Voting Right require Riverstone to notify the Minority Stockholders before the right can take effect: the Participation Right requires notice "at least ten days in advance of the date of the transaction or the date that tender is required," while the Voting Right requires notice "within the time prescribed by law and the Company's Certificate of Incorporation and By-Laws for giving notice of a meeting of shareholders called for the purpose of approving such transaction."[32]

Noting that the different notice periods may have practical implications here, the parties dispute which of the rights under the Drag-Along Riverstone triggered through the Information Statement. If Riverstone invoked the Participation Right, which it maintains it did by exercising the entire Drag-Along,[33] it arguably complied with the requisite ten-day gap (or, could cure any fault by simply

---

[32] Am. Countercls. and Third-Party Compl. Ex. A (Stockholders Agreement), at 2–3.

[33] *See* Riverstone National, Inc.'s Br. in Supp. of Its Mot. for Summ. J. and Answering Br. in Opp'n to Mots. to Dismiss, at 23 ("[The Information Statement] did not state that *only* the voting-rights portion of the drag-along right were [sic] being exercised. It referred generally to the "'drag-along right" provided for in Section 3 of the Stockholders Agreement,' which includes *both* the requirement that the Stockholders vote for the Merger *and* the requirement that the Stockholders tender their shares into the Merger. . . . If Riverstone were only seeking to exercise the voting-rights portion of the drag-along right, it would not have used the word 'and.' The word 'and' would be meaningless if the first half of the paragraph meant the exact same thing as the second half.").

14

extending the requested tender date).[34]  However, the Minority Stockholders

contend that Riverstone only attempted to invoke the Voting Right, as evidenced

by the language in the Information Statement that "Riverstone has exercised the

'drag-along right' provided for in Section 3 of the Stockholders Agreement . . . *and*

*specifically is requiring you to vote to approve the adoption of the Merger*

*Agreement* by executing and delivering the Written Consent,"[35] and further by the

language of the sole resolution in the attached Written Consent, indicative of a

voting requirement, that "the Merger Agreement be, and it hereby is, adopted,

approved and ratified in all respects."[36]  Since the Voting Right required notice

before the vote on the Merger,[37] but Riverstone's controlling stockholder approved

the Merger by written consent pursuant to Section 228, the Minority Stockholders

conclude that Riverstone did not (and no longer can) literally comply with the

requirements to exercise the Voting Right.

---

[34] *See* Am. Countercls. and Third-Party Compl. Ex. B (Information Statement), at 1 (requiring, in a letter dated June 9, 2014, that the Minority Stockholders execute and deliver the consent "within 10 days after the date of this document"); Oral Arg. Tr. 46:19–23 ("So because we exercised a participation right, we did so exactly and literally within the period of time provided, which was ten days in advance of the time tender was required. Tender was asked for by June 19th. We sent [the Information Statement] on June 9th.").

[35] Am. Countercls. and Third-Party Compl. Ex. B (Information Statement), at 1 (emphasis added).

[36] *Id.* at 3.

[37] Specifically, the Minority Stockholders contend that the Merger was carried out pursuant to 8 *Del. C.* § 251, and thus requires notice to stockholders 20 days in advance of the stockholders meeting called for the purpose of approving the Merger. *See* 8 *Del. C.* § 251(c).

15

In addition to arguing that it exercised the Participation Right—and thus satisfied the literal language of the Participation Right's ten-day notice provision—Riverstone argues that its substantial compliance with the Voting Right's notice provision is sufficient to activate the Voting Right. Riverstone points to Delaware case law that permits substantial compliance with a contract provision where literal compliance is impossible and substantial compliance "provides the important and essential benefits of the contract"[38] The Company reasons that "[b]ecause literal compliance with [the Voting Right] portion of the notice provision would have been impossible—since no meeting was ever held—Delaware law allows substantial compliance [in this situation]."[39] Considering the Merger was approved by written consent in lieu of a stockholders meeting, Riverstone suggests that the "prompt notice" requirement found in Section 228(e)[40] is as an appropriate gauge of substantial compliance under the circumstances, and concludes that it satisfied that requirement by notifying the Minority Stockholders of their obligation under the Drag-Along promptly following the Merger.[41]

---

[38] Riverstone National, Inc.'s Br. in Supp. of Its Mot. for Summ. J. and Answering Br. in Opp'n to Mots. to Dismiss, at 18–19 (quoting *Gildor v. Optical Solutions, Inc.*, 2006 WL 4782348, at *7 (Del. Ch. June 5, 2006)).

[39] *Id.* at 21.

[40] *See* 8 *Del. C.* § 228(e) ("Prompt notice of the taking of the corporate action without a meeting by less than unanimous consent shall be given to those stockholders or members who have not consented in writing . . . .").

[41] *See* Riverstone National, Inc.'s Br. in Supp. of Its Mot. for Summ. J. and Answering Br. in Opp'n to Mots. to Dismiss, at 21.

16

## 4. Qualifying Transaction

Fourth, the Minority Stockholders argue that, even if Riverstone successfully invoked the Participation Right, that right is nevertheless inapplicable to this specific transaction. The Participation Right embedded in the Drag-Along is qualified by the condition that the Minority Stockholders must tender their shares only in transactions where they are offered the same price, terms, and conditions as the approving majority stockholders.[42] The Minority Stockholders argue that the Merger does not fit this description, because in connection with the Merger, CAS negotiated a benefit for itself that did not accrue to the Minority Stockholders: "Greystar and its direct and indirect subsidiaries (including Riverstone, as the surviving entity of the Merger) agreed to release any and all claims (including derivative claims) against CAS, its affiliates and each of its and their past, present, and future directors, officers, shareholders and representatives," including two of the directors of Riverstone who are the principal stockholders of CAS's corporate parent.[43] Considering CAS's self-interest in obtaining this release, particularly in light of Halpin and Christian's then-pending investigation into Riverstone's board for potential breaches of fiduciary duty, the Minority Stockholders contend that the

---

[42] Am. Countercls. and Third-Party Compl. Ex. A (Stockholders Agreement), at 3.
[43] Pet'rs'/Countercl.-Defs.' Reply Br. in Further Supp. of Their Mot. to Dismiss the Am. Countercls. and Answering Br. in Opp'n to Resp't's Mot. for Summ. J. Ex. 1 (information about the merger supplied as Annex C to Information Statement), at 7; *see also* Oral Arg. Tr. 21:14–22:6.

17

Merger does not qualify under the Participation Right as a transaction offering the same terms to the Minority Stockholders.

Riverstone rejects the notion that the release of derivative claims against individuals associated with CAS constitutes disparity between the terms offered CAS and the Minority Stockholders, especially here, where all that exists are undeveloped allegations of wrongdoing.[44] If such a release constituted unequal terms, Riverstone argues, "no drag-along right [with an 'equal-terms' provision] in any corporate context could hold," as presumably any disgruntled stockholder bound by a drag-along could break the provision's grip by making allegations of breach of fiduciary duty.[45] Furthermore, Riverstone points out that even if the Minority Stockholders' fiduciary duty claim was ripe, Delaware law provides stockholders with avenues to attack a merger if the merger was pursued to extinguish a derivative claim, which the Minority Stockholders are free to, but have yet failed to, pursue.[46]

### 5. Implied Covenant

Finally, as a means to supplement its arguments against any technical deficiencies in exercising the Drag-Along, Riverstone argues that the Minority Stockholders must consent to the Merger because of the implied covenant of good

---

[44] *See* Oral Arg. Tr. 35:11–36:13, 39:21–41:6.
[45] *See id.* at 39:21–40:43.
[46] *See id.* at 36:13–20.

faith and fair dealing. Riverstone contends that by entering into the Stockholders Agreement, including specifically granting Riverstone the Drag-Along, the Minority Stockholders implicitly "agreed they would participate in any third-party merger supported by Riverstone's controlling stockholder," and not just in those instances explicitly called for in the contract.[47] The bargained-for consequence of such an arrangement, indeed the very reason why the Drag-Along exists, Riverstone argues, is that the Minority Stockholders would forfeit their rights to appraisal.[48] To the extent that this arrangement is not given effect in these circumstances by the express terms of the Drag-Along—for instance, because Riverstone exercised the Drag-Along after the Merger, or the Merger was approved by written consent pursuant to Section 228—Riverstone argues that the Court should "fill the gap" by enforcing the implied covenant on the Minority Stockholders, requiring them to execute the Written Consent and accept the Merger consideration.

---

[47] *Id.* at 30:24–31:2; *see also* Riverstone National, Inc.'s Reply Br. in Further Supp. of Its Mot. for Summ. J., at 9–10 ("The Stockholders Agreement contains an implied obligation that the Stockholders could be forced to consent to any qualifying merger—regardless of whether it was approved by a vote at a stockholder meeting or by written consent pursuant to 8 *Del. C.* § 228.").

[48] *See* Oral Arg. Tr. 42:24–43:16 ("Because CAS was a 91 percent stockholder, there is no reason for these drag-along rights other than to get rid of appraisal. Because CAS did not need [the Minority Stockholders'] consent. CAS did not need to solicit consents or do anything to get a merger done. . . . So there's no purpose to this provision other than to avoid us standing here today. And, frankly, that's what most drag-along provisions are for."); Riverstone National, Inc.'s Reply Br. in Further Supp. of Its Mot. for Summ. J., at 10 ("The [Minority] Stockholders breached this implied obligation, in violation of the purpose of the Stockholders Agreement, and thereby deprived Riverstone of the fruits of its bargain.").

*B. Riverstone Is Not Entitled to Specific Performance*

Although this case raises an interesting legal issue as to whether a common stockholder may contractually waive its statutory appraisal rights for consideration to be set later by a controlling stockholder, I do not find it necessary to resolve that legal question here. For the purposes of my analysis, it is sufficient to assume that a common stockholder *may* waive its appraisal rights *ex ante*. Employing this assumption, I am still left with the question of whether these common stockholders *actually have* waived their appraisal rights through the Stockholders Agreement. A contractual waiver of a statutory right, where permitted, is effective only to the extent clearly set forth in the parties' contract.[49] Here, construction of the unambiguous contract provision does not clearly demonstrate that the Company is entitled to force a waiver of appraisal; rather, it demonstrates the opposite—under the circumstances, the Minority Stockholders have not breached the Stockholders

---

[49] *See In re Appraisal of Ford Holdings, Inc. Preferred Stock*, 698 A.2d 973, 979 (Del. Ch. 1997) (noting, after finding that a preferred stockholder may waive its right to appraisal, that "[s]ince Section 262 represents a statutorily conferred right, it may be effectively waived in the documents creating the security only when that result is quite clearly set forth when interpreting the relevant document under generally applicable principles of construction," and ultimately holding that the indirect language in the relevant documents was "too frail a base upon which to rest the claim that there has been a contractual relinquishment of rights under Section 262"); *Libeau v. Fox*, 880 A.2d 1049, 1057 (Del. Ch. 2005) ("To ensure that the statutory right to partition is not arbitrarily lost, Delaware requires that any contractual relinquishment of the partition right be by clear affirmative words or actions. . . . The waiving contract need not contain an explicit disclaimer of partition rights. Rather, the contract need only contain a procedure for the co-owners to sell their interests that is inconsistent with the later maintenance of a partition action." (footnotes and internal quotation marks omitted)).

20

Agreement by seeking appraisal, and thus the Company is not entitled to specific performance.

The parties hotly contest which of the two components of the Drag-Along the Company sought to trigger through the Information Statement—the Participation Right, the Voting Right, or both. As noted above, the Participation Right requires the Minority Stockholders to tender their shares into the Merger, while the Voting Right requires them to vote their shares in favor of the Merger. I assume for purposes of this Opinion that any defect in notice was not fatal to the Company's attempt to exercise the Drag-Along, and as a consequence this disagreement loses much of its relevance. For the sake of clarity, though, I note that the right Riverstone attempted to invoke is the right to compel a favorable vote. Both the language of the Information Statement and the attached Written Consent are limited to that action. The Information Statement states that "Riverstone has exercised the 'drag-along right' provided for in Section 3 of the Stockholders Agreement . . . and specifically is requiring [the Minority Stockholders] *to vote to approve the adoption of the merger Agreement* by executing and delivering the Written Consent."[50] The Written Consent, the

---

[50] Am. Countercls. and Third-Party Compl. Ex. B (Information Statement), at 1 (emphasis added). At oral argument, in support of its argument that the interpretation I have adopted would render the "and" in the sentence superfluous, *see infra* note 33, Riverstone offered the analogy that "if . . . a parent tells a child, 'Clean your room, and specifically get under your bed,' the parent would not want to come back to a dirty room with a clean spot under the bed." Oral Arg. Tr. 45:11–14. However, I don't find that to be an appropriate analogy under these

21

document designated to carry out that specific order, is accordingly limited to one resolution that "the Merger Agreement be, and it hereby is, adopted, approved and ratified in all respects."[51] Notably, neither document, at any point, mentions the Minority Stockholders' obligation to tender shares, nor does either document specify the number of shares for which tender is being required, as is explicitly contemplated by the Stockholders Agreement.[52] Consequently, I find that Riverstone only invoked the Voting Right of the Drag-Along.

Next, I consider whether the Voting Right requires the Minority Stockholders to engage in the specific performance Riverstone requests— executing a written consent in favor of a previously consummated merger. I assume, as the Company argues, that the only purpose of the Drag-Along is to

---

circumstances; rather, in specifying which portion of the Drag-Along the Company sought to enforce, the Company appears more like the customer who visits a diner and tells her waiter, "I'd like to order breakfast, and specifically I'd like to order pancakes." The customer would not expect the waiter to return with the entire breakfast lineup; indeed, if she did expect that, it would render the specific pancake order superfluous.

[51] Am. Countercls. and Third-Party Compl. Ex. B (Information Statement), at 3.

[52] *See* Am. Countercls. and Third-Party Compl. Ex. A (Stockholders Agreement), at 3 ("[T]he Company may require the Minority Stockholders to participate in such Change-in-Control Transaction *with respect to all or such number of the Minority Stockholders' Shares as the Company may specify* in its discretion . . . . [T]he Minority Stockholders shall tender the *specified number of Shares* . . . ." (emphasis added)). The Company argues that the documents specifically addressed tendering shares through the portion of the Written Consent that asked the Minority Stockholders to provide wire transfer instructions, which the Company argues would only be for the purpose of tendering shares. *See* Oral Arg. Tr. 46:1–8 ("You don't need wire transfer instructions to vote in favor of something. That is absolutely the tender; that's the participation part. The Written Consent . . . shows exactly we were trying to do two things here: the vote to approve, and then the wire transfer instructions, which could only be related to the participation and tender portion of Section 3."). However, I do not find that a request for instructions regarding payment, which I assume would be an obligatory step once the Minority Stockholders had voted in favor of the Merger, constitutes the Company's invocation of its contractual right to tender.

22

waive the Minority Stockholders' appraisal rights. However, as the Company concedes,[53] rather than explicitly waive appraisal rights, the parties opted instead to contract for acts by the Minority Stockholders that would have the effect of waiving appraisal rights—either a forced tender or vote. The Drag-Along's unambiguous language defining these acts is entirely prospective in nature: the Minority Stockholders agreed to, upon advanced notice, tender into or vote in favor of a merger that has been "propose[d];" the Minority Stockholders did *not* agree to, upon notice after the fact, consent to a merger that has been consummated. The Company bargained for a right it did not exercise, and not the similar right it attempted to exercise.[54] In other words, because the Company would have gotten result $X$ had it exercised its rights does not mean the Company is entitled to result $X$ when it failed to exercise those rights. Rather, the Company is limited to the benefit of its bargain, which, according to the literal language of the Drag-Along, does not include the power to require the Minority Stockholders to consent to a transaction that has already taken place.[55] Thus, the Company is

---

[53] *See infra* note 24 and accompanying text.

[54] Although the Company attempts to categorize the consent it seeks as a "vote" in favor of the Merger, the actual stockholder vote on the Merger has already taken place and the transaction already closed. The fact that the Minority Stockholders cannot actually now participate in that stockholder vote is further proof that the rights under the Drag-Along were prospective, and that the Voting Right does not encompass the relief that the Company now seeks.

[55] In an attempt to sidestep the clear, prospective language of the Drag-Along, the Company points to language in the Stockholders Agreement providing that, if the Minority Stockholders' shares are converted into another form of property, "this Agreement shall apply to the securities or other property received upon such conversion . . . in the same manner and to the same extent

not entitled to specific performance according to the express terms of the contractual right it invoked.[56]

Finally, I consider whether Riverstone is entitled to the performance it seeks based on the covenant of good faith and fair dealing implicit in the Stockholders Agreement.[57] An implied covenant of good faith and fair dealing "attaches to every contract," and "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain."[58] The implied covenant is "a commitment to deal fairly[,] in the sense of consistently with the terms of the parties' agreement and its purpose," and thus the Court will find a breach of the covenant where "it is clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good

---

as the Shares," arguing that this language allows the prospective drag-along rights granted in the Stockholders Agreement to be exercised retrospectively. Considering the Company is seeking specific performance of its contractual right to force waiver of common stockholders' statutorily conferred rights, I find that this language lacks the clarity to compel a waiver.

[56] Because of this finding, I need not reach a number of arguments raised by the Minority Stockholders, including that the Company did not provide contractually adequate notice—which, as stated above, I have presumed not to be the case for purposes of this Opinion—and that the Merger does not qualify under the Participation Right as a "transaction on equal terms" in light of the liability release granted to CAS. I also note that, although I have determined that the Company only exercised the Voting Right, my analysis as to that right being limited to prospective mergers would apply with equal force to the Participation Right, had the Company exercised that right as well.

[57] At oral argument I noted that additional discovery may be necessary to resolve the implied covenant issue, but upon further review I find that no further extrinsic evidence is needed.

[58] *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 441–42 (Del. 2005) (footnote and internal quotation marks omitted).

24

faith—had they thought to negotiate with respect to that matter."[59] As our Supreme Court has oft-expressed in recent years, the implied covenant is a gap filler: "The covenant is best understood as a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions."[60]

The implied covenant does not come to Riverstone's aid here, as it is not clear that the Minority Stockholders' refusal to consent to the Merger is arbitrary or unreasonable in the sense that the parties would have agreed to proscribe such conduct had they thought to negotiate the matter. This is not a case where one party is attempting to take advantage of a situation that was unanticipated or unforeseeable at the time of contracting. Both Riverstone and the Minority Stockholders are sophisticated parties, and both are charged with knowledge as to the various ways Riverstone could have carried out a merger under Delaware law, including by written consent pursuant to Section 228. Yet, with full awareness that it could consummate a merger by written consent, without the Minority Stockholders' knowledge or involvement, Riverstone agreed to drag-along rights that by their unambiguous terms did not apply to this retrospective scenario.[61]

---

[59] *Gerber v. Enter. Products Holdings, LLC*, 67 A.3d 400, 418–19 (Del. 2013) (internal quotation marks omitted).

[60] *Dunlap*, 878 A.2d at 441; *see also Nemec v. Shrader*, 991 A.2d 1120, 1126 n.17 (2010).

[61] Although it is not necessary to my conclusion here, I note that the Minority Stockholders point out that such an arrangement is not inexplicable, asserting that there is good reason why the Minority Stockholders would have wanted to limit the scope of the Drag-Along to prospective

Nevertheless, having failed to exercise its drag-along rights as provided by contract—at no fault of the Minority Stockholders—Riverstone now seeks to exercise that analogous, but different, retrospective right.

Our Supreme Court has made clear that the gap-filling function of the implied covenant does not provide relief in a situation such as this, where the Company asks the Court to imply a right for which it did not contract and should have foreseen. In *Nemec v. Shrader*, the Court found that "[t]he implied covenant only applies to developments that could not be anticipated, not developments that the parties simply failed to consider."[62] Applying the *Nemec* Court's guidance to these facts, it is clear that there is no gap for this Court to fill in the parties' drag-along arrangement, but rather a clearly delineated balance between the Minority Stockholders' statutory appraisal rights and Riverstone's contractual ability to force a waiver of those rights. Having not exercised its contractual rights according to the Stockholders Agreement, Riverstone now finds itself within the realm of appraisal rights retained by the Minority Stockholders. Therefore, I do not find that the implied covenant requires the Minority Stockholders to now execute the Written Consent and accept the Merger consideration.

---

mergers, and would have resisted an obligation to consent to a merger that has already been consummated: in a prospective scheme, the Minority Stockholders would be able to seek to avoid an oppressive merger by application to this Court. *See* Oral Arg. Tr. 16:8–17, 52:5–53:6.
[62] *Nemec*, 991 A.2d at 1126.

## IV. CONCLUSION

For the foregoing reasons, the Minority Stockholders' Motions for Summary Judgment[63] are granted, and Riverstone's Motion for Summary Judgment is denied. The parties should submit an appropriate form of order.

---

[63] *See infra* note 16.